Filed 11/6/24  P. v. Rodriguez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANDRES RODRIGUEZ,<br><br>    Defendant and Appellant. | D081520<br><br><br>(Super. Ct. No. SCS310633) |

APPEAL from a judgment of the Superior Court of San Diego County, Maryann D'Addezio, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn, and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Andres Rodriguez of possession of a firearm by a person previously convicted of a felony (Pen. Code,[1] § 29800, subd. (a)(1); counts 4 and 5), unlawful possession of ammunition (§ 30305, subd. (a)(1); count 6), and attempting to dissuade a witness from prosecuting a crime by force or threat (§ 136.1, subds. (b)(2) & (c)(1); count 7).[2] In a bifurcated bench trial, the court found true an allegation that Rodriguez committed the attempted witness dissuasion offense for the benefit of a criminal street gang (§ 186.22, subd. (b)), as well as various sentencing enhancements. The court sentenced Rodriguez to an indeterminate life sentence on count 7, and a determinate term of 13 years eight months, on the remaining counts.

Rodriguez makes three contentions on appeal. First, he contends the trial court erred by denying his motion to suppress the evidence obtained by police officers during the search of his girlfriend's vehicle. Next, Rodriguez asserts insufficient evidence supports his conviction for attempting to dissuade a witness, and that the trial court provided faulty jury instructions pertaining to this charge. Finally, Rodriguez contends the court erred in finding true an allegation he committed the offense of attempted witness dissuasion for the benefit of a criminal street gang.

---

[1] All undesignated statutory references are to the Penal Code.

[2] Counts 1 through 3 pertain to an incident alleged to have occurred on September 16, 2018. The jury convicted Rodriguez of count 3 (§ 30305, subd. (a)(1)) but could not reach verdicts on counts 1 (§ 245, subd. (a)(2)) or 2 (§ 29800, subd. (a)(1)). Thereafter, Rodriguez pled guilty to count 2 and the prosecution dismissed count 1. Rodriguez raises no appellate issues with respect to counts 1 through 3, and we therefore do not discuss the facts related to these charges.

We agree insufficient evidence supports the gang enhancement accompanying the attempted witness dissuasion in count 7. Specifically, we conclude there is insufficient evidence that Rodriguez committed the crime with the specific intent to confer a common benefit on other gang members within the meaning of section 186.22, as amended by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, § 1) (Assembly Bill 333). Accordingly, we reverse the gang enhancement and remand the matter for a full resentencing. We reject Rodriguez's additional contentions and otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Possession of Firearms and Ammunition (Counts 4-6)*

In the early morning hours of May 6, 2019, San Diego Police Officer Irving Rosas observed a car with dark tinted windows run a redlight. Officer Rosas conducted a traffic stop, and when he approached the car he could not see inside due to the dark tint on the windows. The driver of the vehicle, later identified as Rodriguez, did not comply with Officer Rosas's commands to fully roll down the car windows. Rodriguez partially rolled down the rear window, and he provided his driver's license to the officer.

Through the rear window, Officer Rosas could see a passenger, Jane Doe,[3] in the front passenger seat. Although he could see the top of Rodriguez's and Doe's heads, he could not see their hands. Officer Rosas was concerned he could not see their hands because the vehicle stop was in a high crime area and he believed there could be weapons in the car. The officer asked Rodriguez to step out of the vehicle and Rodriguez refused. Another officer then arrived to assist with the stop.

---

[3]    We refer to the passenger as Jane Doe to protect her privacy interests. (See Cal. Rules of Court, rule 8.90(b)(10).)

Officer Rosas conducted a records check while the additional officer remained with Rodriguez and the vehicle. The records check revealed the car was registered to an individual named Ashley McNamara, and that Rodriguez was currently out on bail for an assault with a deadly weapon charge. Officer Rosas asked Rodriguez and Doe to exit the vehicle. After Rodriguez complied, he repeatedly yelled at Doe not to speak to the officers or comply with their commands. Officer Rosas placed Rodriguez under arrest for delaying a peace officer and detained him in the back of the patrol car.

Based on Rodriguez's pending weapons-related offense and his confrontational demeanor, Officer Rosas conducted a "vehicle pat-down" to search the car for weapons. During his initial search, Officer Rosas found a 12-gauge shotgun shell in the passenger glovebox. Officer Rosas placed Rodriguez, who had been previously convicted of a felony,[4] under arrest for unlawful possession of ammunition. The officer then searched the remainder of the car incident to Rodriguez's arrest. In the trunk, he found a loaded shotgun and ammunition, as well as a backpack with four magazines, a handgun, and a card with Rodriguez's name. The officers arrested Rodriguez and transported him to the county jail.

*B. Attempted Witness Dissuasion (Count 7)*

Following Rodriguez's arrest, McNamara (the owner of the vehicle) visited him in the San Diego County jail on May 9, 2019. McNamara listed herself as Rodriguez's girlfriend on his "inmate personal profile." The San Diego County Sheriff's system recorded their visit, and San Diego Police Detective Nestor Hernandez listened to the recording and recounted its

---

[4] At trial, the parties stipulated Rodriguez had been convicted of a prior felony and was therefore prohibited from possessing a firearm or ammunition.

contents during Rodriguez's jury trial. The recording was played before the jury.

During the visit, Rodriguez told McNamara about his arrest in her vehicle three days prior. Rodriguez explained that he believed his detention during the traffic stop was illegal. He told McNamara that he was "done" if Doe gave the police permission to search the car.

McNamara said that Doe had been "rambling on," and Rodriguez responded, "that bitch said something." McNamara asked how long it would take to get Rodriguez's "paperwork," and whether Doe's statements to the police would "show when they get the paperwork."[5] Rodriguez responded that the paperwork should take around two weeks.

The following exchange then occurred between Rodriguez and McNamara:

> "[RODRIGUEZ]: I (unintelligible) shoot her fucking head. Fucking bitch, I wonder what the fuck she told them. She's told them something, that's how she's wondering. Unless she told them something. That's that fucking guilty conscience.
>
> "[MCNAMARA]: Yeah. Yup.
>
> "[RODRIGUEZ]: Tell them to shoot her in the fucking head. (Unintelligible). Mm, I'm pissed. I'm a violent mother fucker now.
>
> "[MCNAMARA]: Well, I'm going to talk to Trusty. I guess. He wants his phone from her. He said that phone is his."

Detective Hernandez identified "Trusty" as David Delgado, a "companion of Mr. Rodriguez." Testifying as the prosecution's gang expert,

---

[5] According to Detective Hernandez, paperwork refers to police reports or other documentation that contains witness statements to law enforcement.

Detective Hernandez opined that both Rodriguez and Trusty were documented members of the "Sidro" gang.

Around five days after McNamara's jail visit, Rodriguez received a phone call from an unidentified woman. The woman informed Rodriguez that McNamara had been arrested for drug-related offenses. Rodriguez and the woman then had the following exchange:

> "[RODRIGUEZ]: What's up with [Doe]? Where she been at?
>
> "[UNIDENTIFIED WOMAN]: Uh, I don't know. I saw on Instagram she's been with Juera [phonetic].
>
> "[RODRIGUEZ]: Does she have a new haircut?
>
> "[UNIDENTIFIED WOMAN]: (laughing) No.
>
> "[RODRIGUEZ]: Not yet?
>
> "[UNIDENTIFIED WOMAN]: No, I was talking to Ashley [McNamara], um like I guess the night before she got locked up or something, and um, she was like, she was like, she told me what you said about [Doe]. I was dying. She was like I'm going to tell him.
>
> "[RODRIGUEZ]: Yeah, no. Tell Trusty to do it.
>
> "[UNIDENTIFIED WOMAN]: Okay. (laughing) [¶] . . . [¶] She was telling me, she was like I don't know. I don't want it to come back to me, and I was like how? I was like (unintelligible).
>
> "[RODRIGUEZ]: Yeah, it's like fool, like if you can't be there for me, you need to be there for me. Like if I tell you to do something, do it. Tell Trusty that I said to give [Doe] a haircut."

The woman told Rodriguez she thought it was weird that Doe "got to walk away" after he was arrested during the traffic stop. She stated Doe "should have got locked up on the spot." Rodriguez responded, "Oh no, that's why I was like to just to be, just to stay on the safe side, give her a haircut," and the woman said she would let "him" know.

C. *Defense Evidence*

Rodriguez testified in his own defense and asserted he was unaware there were firearms in the back of McNamara's car. He explained that he was upset with Doe because she was drunk during the traffic stop, and he did not want her to talk to the police because he believed they might use her statements "as a way to mess with [him]." He stated he was embarrassed because he was arrested with another woman in McNamara's car, and because Doe had been "sleeping" with both Trusty and Rodriguez. Rodriguez denied directing McNamara to tell Trusty to harm Doe. He claimed that after he was arrested, Doe attended some of his court appearances and provided him with money while he was incarcerated.

D. *Trial Court Proceedings*

The prosecution charged Rodriguez with two counts of possession of a firearm by a person previously convicted of a felony (§ 29800, subd. (a)(1); counts 4 & 5) and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 6) related to the weapons found during the May 6, 2019, traffic stop. The prosecution also charged Rodriguez with attempting to dissuade a witness from prosecuting a crime by force or threat (§ 136.1, subds. (b)(2) & (c)(1)) related to his threats during the May 9, 2019 jail visit, and further alleged that he committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)). Additionally, the prosecution alleged Rodriguez committed counts 4 through 6 while out on bail (§ 12022.1, subd. (b)), and

7

that he suffered a prior serious felony conviction and strike prior conviction (§§ 667, subd. (b)-(i), 1170.12).

Rodriguez filed a motion to suppress the evidence obtained by the police during their search of McNamara's car. As we discuss further below, the trial court found there was no Fourth Amendment violation and denied the motion. The case then proceeded to trial.

The jury found Rodriguez guilty of counts 4 through 7. At a bifurcated bench trial, the trial court found true the allegations Rodriguez committed counts 4 through 6 while out on bail, suffered a serious felony prior and strike prior conviction, and committed count 7 for the benefit of a criminal street gang.

The court sentenced Rodriguez to an indeterminate term of 14 years to life on count 7. On the remaining counts, the court sentenced Rodriguez to an aggregate determinate term of 13 years eight months, as follows: count 2: four years; count 3: four years stayed pursuant to section 645; count 4: 16 months, plus two years for the out-on-bail enhancement; count 5: 16 months; and count 6: four years, stayed pursuant to section 654. The court imposed a consecutive five-year term pursuant to sections 667, subdivision (a) and 1192.7, subdivision (c), and stayed the out-on-bail enhancements attached to counts 5 and 6 pursuant to section 1170.1, subdivision (a).[6]

Rodriguez timely appealed.

---

[6] The abstract of judgment does not reflect the imposition of the five-year term pursuant to sections 667, subdivision (a) and 1192.7, subdivision (c). The trial court will be required to conduct a full resentencing on remand, and we assume the abstract of judgment will correctly reflect the new sentence.

DISCUSSION

I.

*The Trial Court Properly Denied Rodriguez's Motion to Suppress Evidence*

Rodriguez contends the trial court erroneously denied his motion to suppress the evidence obtained by Officer Rosas during the May 6 traffic stop. According to Rodriguez, the stop was unduly prolonged beyond the time required to complete the mission of issuing the traffic citation. He avers the search of the vehicle occurred during this period of prolonged detention, and therefore that the search was unconstitutional. As we discuss, we conclude there was no Fourth Amendment violation and affirm the trial court's order.

A.    *Additional Background*

Rodriguez filed a motion to suppress the evidence pursuant to section 1538.5, and the trial court conducted an evidentiary hearing. Officer Rosas testified at the hearing, and the prosecution entered into evidence the video from his body worn camera depicting the traffic stop. The prosecution also entered into evidence a satellite image of the intersection where the traffic stop occurred, and photos of the firearms and ammunition discovered in the vehicle.

Officer Rosas testified that at approximately 3:14 a.m. on May 6, 2019, a car with dark tinted windows caught his attention. He could not see the occupants of the vehicle due to the dark window tint, and he believed this to be a violation of the Vehicle Code. The officer positioned his patrol car behind the vehicle to conduct a traffic stop and the car then ran a red light. Officer Rosas activated the lights on his patrol car and initiated a traffic stop.

When Officer Rosas approached the car, the driver, later identified as Rodriguez, partially rolled down the rear driver's side window. The officer asked Rodriguez to roll down the front window, and Rodriguez indicated that

9

the driver's side front window would not roll down. Rodriguez asked Officer Rosas to go to the passenger's side of the vehicle, and the officer declined. When Officer Rosas asked Rodriguez to fully roll down the rear driver's side window, Rodriguez refused and said "I don't have to." Rodriguez handed his driver's license to Officer Rosas through the partially opened window, seen in an excerpt from the body worn camera below:



Through the rear window, Officer Rosas observed the "head of an alcohol bottle" in the backseat, and he could smell the odor of alcohol emitting from the vehicle. From this vantage point, Officer Rosas could not see what Doe, who was sitting in the front passenger seat, and Rodriguez, were doing in the front half of the vehicle. Officer Rosas explained it is important for officer safety to see what the occupants of a vehicle are doing in case there are weapons.

Within approximately five and a half minutes of the start of Officer Rosas's body-worn camera video depicting the traffic stop, another officer arrived and stood at the passenger side of the vehicle. Officer Rosas conducted a records check in his patrol car while the other officer kept "an eye on the vehicle." According to Officer Rosas, a records check is a standard

part of a traffic stop to determine whether the driver's license is valid and to review the driver's criminal history.

The records check revealed Rodriguez was out on bail for assault with a deadly weapon. After Officer Rosas learned this information, he wanted to make sure there were "no weapons involved since [Rodriguez] was currently on bail for a weapons-related charge." Consequently, around ten minutes into the stop, Officer Rosas asked Rodriguez to step out of the vehicle and he conducted a pat-down search of Rodriguez's person for weapons. Citing to Rodriguez's "lack of cooperation in the beginning" of the stop, the officer placed Rodriguez in handcuffs during the pat-down.

Officer Rosas then required Rodriguez to sit on the front hood of his patrol car as he spoke with Doe. Officer Rosas described Doe as calm, but he believed she was obviously intoxicated. Doe told the officer she was on the phone with an attorney, and Rodriguez yelled at her to stop talking to the officers. Officer Rosas asked Doe to step out of the vehicle, and Rodriguez yelled that she did not have to get out of the car. After Rodriguez continued to direct Doe not to comply with the officer's orders, Officer Rosas placed Rodriguez under arrest for delaying a peace officer and required him to sit in the back of the patrol car. (§ 148, subd. (a)(1).) Doe eventually exited the car, and Officer Rosas proceeded with a search of the vehicle.

During his initial search, Officer Rosas found a knife in the driver-side door, a twelve-gauge shotgun shell in the glove box, an open bottle of alcohol on the rear floorboard, and an oxycodone pill container and a pipe that he believed to be paraphernalia for drug use in the center console. Officer Rosas confirmed that Rodriguez had been convicted of a prior felony and was therefore prohibited from possessing the shotgun shell he found in the glove box. Once Officer Rosas confirmed Rodriguez's prior felony conviction, he

11

placed Rodriguez under arrest for unlawful possession of ammunition. (§ 30305, subd. (a)(1).)

Officer Rosas then searched the rest of the vehicle incident to Rodriguez's arrest. In the trunk, he found a loaded shotgun, a box of 12-gauge ammunition, and a backpack that contained a wallet, a handgun with the serial numbers scratched off, and four magazines, three of which were loaded. The wallet had a card with Rodriguez's name.

During his testimony at the evidentiary hearing, Officer Rosas acknowledged that Rodriguez had already been placed under arrest for delaying an officer when he conducted his initial search of the vehicle for weapons. However, Officer Rosas opined the weapons-related search was still necessary because there was a possibility either Doe or Rodriguez would return to the car after the detention ended. He cited to several factors that contributed to his decision to conduct the vehicle pat-down, including the following: he could not see inside the car due to the dark window tint; Rodriguez had a pending weapons-related charge; and Rodriguez had a "passive-aggressive" and "confrontational" demeanor. Officer Rosas explained that the scope of the initial vehicle pat-down was limited to places in which the driver and passenger could have immediate access to weapons. However, after Rodriguez was placed under arrest for unlawful possession of ammunition, the purpose of the search was to look for "any contraband" related to that specific charge.

Following the presentation of evidence, Rodriguez argued the items Officer Rosas found during his search of the vehicle were the "result of a prolonged detention." According to Rodriguez, Officer Rosas had everything he needed to issue a citation within six minutes and two seconds of the stop. However, the officer continued to unlawfully prolong the stop by conducting a

12

search of the vehicle. Rodriguez also asserted the evidence demonstrated Officer Rosas was not actually concerned for officer safety before the weapons pat-down, noting that he left another officer alone by the vehicle while he conducted the records check. Accordingly, Rodriguez asked the court to suppress any evidence obtained by Officer Rosas during the search of the car.

The court found the search was proper and denied Rodriguez's motion to suppress. In support of its ruling, the court first found there was "ample evidence" to justify the initial traffic stop. The court then found it was reasonable for Officer Rosas to conduct a pat-down search of the vehicle once the officer learned Rodriguez was out on bail for a weapons-related charge. The court pointed to Rodriguez's lack of cooperation, the tinted car windows, the time of night during the stop, and the smell of alcohol emitting from the car. Finally, the court found the search of the rest of the vehicle was justified as a search incident to arrest once the officer discovered the shotgun shell during his initial pat-down search of the car.

### B.    Analysis

"The Fourth Amendment guarantees the right to be free of unreasonable searches and seizures by law enforcement personnel." (*Blakes v. Superior Court* (2021) 72 Cal.App.5th 904, 910.) A defendant in a criminal case may move the trial court to suppress evidence obtained by law enforcement on the grounds a warrantless search or seizure was unreasonable. (§ 1538.5, subd. (a)(1)(A).) On review of a trial court's denial of a suppression motion, we review the court's factual findings for substantial evidence, and independently review whether the search was reasonable based on those facts. (*People v. Parson* (2008) 44 Cal.4th 332, 345 (*Parson*); *People v. Oldham* (2000) 81 Cal.App.4th 1, 9.) We must give deference to the trial

court's factual findings, considering "the evidence in the light most favorable to the trial court's order." (*People v. Lee* (2019) 40 Cal.App.5th 853, 860–861.)

Under Fourth Amendment case law, law enforcement officers may temporarily seize an individual during a traffic stop to permit investigation of the traffic violation. (*Rodriguez v. United States* (2015) 575 U.S. 348, 354 (*Rodriguez*).) The constitutionally tolerable duration of the seizure is determined by the "seizure's 'mission' "—that is, addressing the traffic violation that led to the stop and attending to "related safety concerns." (*Ibid*.) The traffic stop should " 'last no longer than necessary to effectuate' " the purpose of the stop. (*Ibid*.) "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." (*Ibid*.)

In *Rodriguez*, the Supreme Court explained the typical scope of an officer's mission during a traffic stop. (*Rodriguez, supra*, 575 U.S. at p. 355.) The Court held that in "determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (*Ibid*. [cleaned up].) The Court reasoned that these records checks are permissible because they serve "the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." (*Ibid*.)

Moreover, an officer may perform a limited search of a vehicle's passenger compartment during a traffic stop if the officer has a reasonable belief that an individual involved in the stop is "dangerous and may gain immediate control of weapons." (*People. Brueckner* (1990) 223 Cal.App.3d 1500, 1506; *Mich. v. Long* (1983) 463 U.S. 1032, 1049 (*Long*).) However, the

14

search is only "permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (*Long*, at p. 1049.) The search is "limited to those areas in which a weapon may be placed or hidden." (*Ibid*.)

Here, as an initial matter, we note Rodriguez does not challenge the basis for the traffic stop. We agree the stop was permissible based on Officer Rosas's observation that Rodriguez failed to stop at a traffic light. (Veh. Code, § 21453, subd. (a) ["[a] driver facing a steady circular red signal . . . shall remain stopped until an indication to proceed is shown"].) Rodriguez argues, however, that his detention should not have continued beyond the point at which Officer Rosas confirmed his license was valid. According to Rodriguez, once Officers Rosas confirmed this information, he "could have gotten [Rodriguez] and [Doe] out of the car, had them stand by for a minute or two while Officer Rosas wrote up the citation, obtained a promise to appear from [Rodriguez], and then sent them on their way."

We are not persuaded. As the reviewing court, we may not hypothesize about other avenues the officer could have taken, or "indulge in unrealistic second-guessing" of the officer's conduct. (*People v. Brown* (2015) 61 Cal.4th 968, 984 [cleaned up].) Rather, our task is to review the record and factual findings by the trial court, and to determine whether the detention and search were reasonable under the circumstances. (*Parson, supra*, 44 Cal.4th at p. 345.)

Applying this standard to facts before us, we do not find six minutes to be an unreasonable amount of time for Officer Rosas to conduct a records check, particularly where Rodriguez was, as he describes in his reply brief,

15

"verbally obstreperous" with the officers. It would have taken much less time if Rodriguez had been more cooperative or Officer Rosas less patient. Officer Rosas explained during his testimony that the purpose of the records check was to determine if Rodriguez had a valid driver's license and to review his criminal history. The Supreme Court has held these types of inquiries are incident to the safe completion of the traffic stop and constitutionally permissible because they serve the stop's ultimate mission. (*Rodriguez, supra*, 575 U.S. at p. 355; see also *People v. Lopez* (2019) 8 Cal.5th 353, 363, fn. 4 [a temporary detention during a traffic stop may "include a 'determin[ation] whether there are outstanding warrants against the driver' [citations] and a criminal history check."].) Accordingly, we find no Fourth Amendment violation resulting from Officer Rosas's decision to conduct a records check, or the time in which it was completed.

The circumstances of the stop also justified Officer Rosas's decision to conduct a limited search of the vehicle's passenger compartment to check for weapons. Citing to Rodriguez's pending weapons-related charge, Officer Rosas explained that the purpose of his initial search of the vehicle was to ensure there were no weapons available to Rodriguez or Doe if and when they reentered the car. If they had merely been cited for a traffic infraction and sent on their way, they presumably would have gotten back into the car. Moreover, the officer's belief that Rodriguez may have had access to weapons in the vehicle was supported by specific and articulable facts in the record and reasonable inferences that may be drawn from those facts. These facts include that Rodriguez was out on bail for a weapons-related offense, his demeanor with the officers was "confrontational," the traffic stop took place late at night, and the officers had limited visibility into the car because of the window tint. As the trial court found, these facts, when taken together,

16

supported a limited search of the vehicle's passenger compartment for weapons, during which Officer Rosas found contraband that the Fourth Amendment did not require him to ignore. (See *Long, supra*, 463 U.S. at p. 1050 [if, while an officer performs a limited search of a car for weapons, "the officer should . . . discover contraband other than weapons, [the officer] clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."]

Rodriguez relies on *People v. Gyorgy* (2023) 93 Cal.App.5th 659 (*Gyorgy*) to support his argument that the initial weapons-related search impermissibly extended the traffic stop beyond the time necessary to effectuate the stop's mission. We disagree and find the facts of *Gyorgy* inapposite to Rodriguez's case.

In *Gyorgy*, officers conducted a traffic stop and required the defendant to exit the vehicle. (*Gyorgy, supra*, 93 Cal.App.5th at pp. 664–665.) Around seven and a half minutes into the stop, before officers performed any tasks incident to the traffic stop, an officer informed the defendant he intended to take the police dog around the defendant's truck. (*Id.* at p. 665.) The officer also asked the defendant about his status as a registered sex offender and whether he was on probation or parole. (*Id.* at p. 664.) The police dog alerted to the bed of the truck around 11 minutes and 54 seconds into the stop, and the officers found methamphetamine and a firearm during a search of the truck's interior. (*Id.* at p. 666.)

On appeal, the *Gyorgy* court held that the officer's actions "detoured from the traffic stop's mission almost immediately." (*Gyorgy, supra*, 93 Cal.App.5th at p. 672.) The record revealed the officer had not performed any tasks incident to the traffic stop before the dog sniff, like conducting a records check or reviewing Gyorgy's license status. (*Ibid.*) The court explained that

17

although the officers were permitted to investigate matters unrelated to the traffic stop, the investigation of those other matters should not prolong the time required to issue the citation. (*Ibid*.) Accordingly, because the dog sniff and the officer's investigatory questions prolonged the traffic stop, and the prolonged detention was not otherwise supported by reasonable suspicion of criminal activity, the court held the detention and related vehicle search violated the Fourth Amendment. (*Id*. at pp. 675–676.)

By contrast, here, Officer Rosas reviewed Rodriguez's license status and his criminal history within six minutes of the initial detention. Once he learned Rodriguez was out on bail for a weapons-related offense, Officer Rosas made the decision to conduct a search of the car to ensure there were "no weapons in the immediate reach of the driver or occupants of the vehicle." In contrast to the officers' conduct in *Gyorgy*—in which the officers investigated matters unrelated to the traffic stop—here the initial search of the vehicle was *incident* to the safe completion of the stop. The search was intended to ensure the vehicle's occupants did not have access to weapons during or immediately after the performance of the officer's duties in issuing the citation.

Although Rodriguez contends the evidence showed Officer Rosas's safety concerns were "minimal at best," it is not our function as the reviewing court to judge credibility. It is the trial court, rather than the appellate court, that "sits as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences" from the evidence. (*People v. Needham* (2000) 79 Cal.App.4th 260, 265.) The reviewing court is required to view the evidence and trial court's factual findings "in a light most favorable to the order denying the motion to suppress and any conflicts in the evidence are resolved in favor of the [trial] court's ruling." (*People v. Tully* (2012) 54

18

Cal.4th 952, 979 [cleaned up].) Reviewing the evidence under this standard, we conclude Officer Rosas presented specific articulable facts to support his belief that Rodriguez may have had access to weapons. Thus, the Fourth Amendment permitted his limited search of the vehicle compartment for weapons. Once Officer Rosas discovered ammunition in the glovebox that Rodriguez was legally prohibited from possessing, the officer was permitted to search the remainder of the vehicle for evidence related to this crime as a search incident to arrest. (See *Arizona v. Gant* (2009) 556 U.S. 332, 351 ["Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or *it is reasonable to believe the vehicle contains evidence of the offense of arrest.*" (Italics added.)].)

In summary, we perceive no Fourth Amendment violation by Rodriguez's detention and Officer Rosas's search of the car. We therefore conclude the trial court did not err by denying Rodriguez's motion to suppress.

## II.

*The Record Does Not Demonstrate Reversible Error Pertaining To Count 7*

Rodriguez argues insufficient evidence supports his count 7 conviction for attempting to dissuade a witness from prosecuting a crime by force or threat. (§ 136.1, subds. (b)(2) & (c); count 7.) He also contends the trial court should have instructed the jury with the elements of "attempt" as described by CALCRIM No. 460.[7] For the reasons we discuss further below, we find no merit to Rodriguez's contentions and affirm.

---

[7] The pattern jury instruction set forth in CALCRIM No. 460 reflects the definition of attempt in section 21a. It requires the People to prove the defendant intended to commit a target offense, and the defendant took a direct but ineffectual step toward committing the offense. (§ 21a.) A direct

19

### A.    *Substantial Evidence Supports Count 7*

The jury found Rodriguez guilty of section 136.1, subdivision (b)(2), and found true an allegation under subdivision (c) of this statute.  Section 136.1, subdivision (b)(2), provides in pertinent part: "every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from . . . [c]ausing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof," shall be punished by imprisonment in a county jail for not more than a year or in the state prison.  Subdivision (c) of section 136.1 provides for additional punishment "[w]here the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person."

In reviewing Rodriguez's challenge to the sufficiency of the evidence, we "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [cleaned up].)  "We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency.  Rather, before we can set aside a judgment of conviction for insufficiency of the evidence, it must clearly appear that upon no hypothesis whatever is there

---

step requires more than mere planning or preparation to commit a target offense.  (CALCRIM No. 460.)

20

sufficient evidence to support [the jury's finding]." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 145 [cleaned up].)

Here, as an initial matter, we note that although the information alleged the dissuasive conduct underlying count 7 occurred solely on May 9, 2019, at trial the prosecution expanded this charge (without amending the information) to include Rodriguez's conduct during the May 6, 2019, traffic stop. But the record indicates that the jury did not rely on Rodriguez's conduct during the traffic stop to find him guilty of count 7. The jury's verdict included a true finding that Rodriguez accompanied his dissuasive conduct with a threat of force, but the record does not contain evidence that Rodriguez made threats of force during the May 6 traffic stop. We therefore focus our discussion on Rodriguez's comments during the May 9 jail visit, and as we discuss, we conclude these statements provide substantial evidence to support his conviction. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [when a purported inadequacy of proof is factual, "reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground."].)

Rodriguez avers that his conversation with McNamara during the May 9 jail visit is legally insufficient to support his conviction because the dissuasive conduct occurred entirely *after* his arrest. He argues a line of authority limits the scope of prohibited behavior under section 136.1, subdivision (b), to *pre-arrest* conduct. We disagree. Although one court has determined that subdivision (b)(1) of section 136.1 is limited to pre-arrest dissuasive conduct, the subdivision Rodriguez is alleged to have violated—subdivision (b)(2)—is not limited to pre-arrest behavior. (See *People v. Fernandez* (2003) 106 Cal.App.4th 943, 951 [pre-arrest conduct insufficient to

21

support conviction where defendant charged with section 136.1, subdivision (b)(1)].) Subdivision (b)(2) focuses on conduct that affects whether a complaint, information, or indictment is filed, and therefore it is not limited to pre-arrest conduct. By contrast, subdivision (b)(1) "punishes a defendant's *pre-arrest* efforts to prevent a crime from being reported to the authorities." (*Fernandez*, at p. 950, italics added.) The cases to which Rodriguez cites do not limit the application of subdivision (b)(2) to pre-arrest conduct, nor does the plain language of the statute.[8] (See *ibid.*)

Rodriguez additionally contends his threats of violence were, if taken literally, a solicitation to commit murder (§ 653f, subd. (b)), rather than an attempt to dissuade Doe from cooperating with law enforcement. Rodriguez posits the following example of a statement that could serve as the basis for a charge of attempted witness dissuasion with a threat of force: "[t]ell them to tell [Doe] not to cause a criminal prosecution to be initiated or we will shoot you in head." We find Rodriguez's argument unpersuasive for two reasons.

First, whether Rodriguez's statements could also constitute the crime of solicitation to commit murder is not before us. Rather, we are tasked with determining whether the prosecution presented sufficient evidence that is reasonable, credible, and of solid value, to support Rodriguez's conviction under section 136.1, subdivision (b)(2). (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Second, Rodriguez's argument suggests that for the purpose of section

---

8    Our high court in *People v. Reynoza* (2024) 15 Cal.5th 982, 1013 recently clarified that dissuasive conduct that occurs entirely *after* an underlying charging document is filed is insufficient to support a conviction under section 136.1, subdivision (b)(2). However, its holding did not extend to conduct that occurs after an arrest but before charges are filed. Here, the dissuasive conduct relied upon by the prosecution occurred entirely before the underlying charging document pertaining to the May 6, 2019, weapons-related offenses was filed, and therefore this case is not impacted by *Reynoza.*

22

136.1, subdivision (b)(2), the prohibited conduct must be an attempt to *convince* the victim or witness not to participate in the initiation of criminal prosecution. But the language of this section prohibits an individual from attempting to dissuade *or prevent* a victim or witness from participating in the initiation of prosecution. (§ 136.1, subd. (b)(2) [prohibiting conduct in which a person "attempts to prevent or dissuade another person."].) Had Rodriguez accomplished the violence he sought against Doe, she certainly would have been *prevented* from assisting in his prosecution. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 71 (*Pettie*) ["[m]urder is one way to prevent a witness" from cooperating with law enforcement for the purpose of section 136.1, subd. (b).].) That Rodriguez's attempts were ultimately unsuccessful, either because violence was not actually inflicted upon Doe, or because Doe never learned of his threats, is no defense. (See *People v. Foster* (2007) 155 Cal.App.4th 331, 335 [for the purpose of section 136.1, "[a] threat need not actually deter or reach the witness because the offense is committed when the defendant makes the attempt to dissuade the witness."].)

Furthermore, there is no " 'talismanic requirement that a defendant must say "Don't testify" or words tantamount thereto, in order to commit [a violation of section 136.1]. As long as his words or actions support the inference that he . . . attempted by threat of force' " to induce or prevent a person from participating in his prosecution, a conviction is properly supported. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344 [cleaned up].) Drawing all inferences in favor of the judgment, as we must, we conclude the record supports such a finding.

Throughout the May 9 jail visit between Rodriguez and McNamara, Rodriguez expressed concern that Doe may have spoken or cooperated with law enforcement regarding the firearms offenses for which he was arrested.

23

He told McNamara that if Doe had permitted the officers to search the vehicle during the traffic stop, he was "done." When McNamara indicated that Doe had been "rambling on," he stated, "I wonder what the fuck [Doe] told them," and "that bitch said something." Rodriguez then instructed McNamara to "tell them to shoot [Doe] in the fucking head." McNamara responded that she would speak with Trusty, a fellow gang member, about the matter. These statements reflect Rodriguez's intent to prevent Doe from cooperating with law enforcement, and McNamara's acquiescence to his requests.

Rodriguez's statements during a subsequent call with an unidentified woman provide further context for the intent of his comments to McNamara. During this call, the woman stated it was "weird" that Doe was not arrested during the May 6, 2019, traffic stop, and that Doe "should have got[ten] locked up on the spot." Rodriguez agreed and explained that he wanted Doe to get a "haircut" to "stay on the safe side." When the woman told Rodriguez that Doe had not yet received a "haircut," he told her to tell Trusty "to do it." These comments, when viewed in the context of Rodriguez's request to McNamara a week prior that "they" should shoot Doe in the head, support the prosecution's argument that Rodriguez attempted to prevent Doe from cooperating with law enforcement.

Although Rodriguez argues his comments were delivered in anger and not intended to be taken literally, it is not our function to reweigh the evidence on appeal. The jury heard recordings of Rodriguez's statements during the trial, and it was the jury's function as the trier of fact to determine his intent. The evidence before the jury was that Rodriguez told more than one person to tell others to inflict violence upon Doe. This evidence provided substantial evidence to support his conviction, particularly when viewed in

24

the context of his suspicion that Doe had cooperated with law enforcement. Accordingly, we conclude that the jury's guilty verdict for count 7 was supported by sufficient evidence.

### B. *The Purported Instructional Error Was Harmless*

Rodriguez asserts the jury instructions were prejudicially deficient because he was "charged with the crime of an unlawful '<u>attempt</u> to prevent or dissuade a witness,'" and the court did not sua sponte provide the legal definition of "attempt," as reflected in CALCRIM No. 460. Rather, the trial court instructed the jury with CALCRIM No. 2622, without objection by Rodriguez. CALCRIM No. 2622 provided the elements for the charge of attempted witness dissuasion under section 136.1, stating, in relevant part, the prosecution was required to prove Rodriguez "tried to prevent or discourage [Doe] from cooperating or providing information so that a complaint, indictment, or information could be sought and prosecuted, and from helping to prosecute that action."

Even assuming the trial court was required to instruct sua sponte on the elements of attempt as defined in CALCRIM No. 460, we conclude its omission would be harmless under either the federal *Chapman* standard of prejudice or under the state-based *Watson* standard of prejudice.[9] (See *Pettie, supra*, 16 Cal.App.5th at p. 69 [failure to instruct on element of the offense subject to harmless error analysis]; *People v. Cain* (1995) 10 Cal.4th 1, 44 (*Cain*) [failure to instruct on the elements of attempt was harmless under

---

[9] See *Chapman v. California* (1967) 386 U.S. 18, 24 [the prosecution bears the burden of showing that a federal constitutional error was harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [the defendant must demonstrate the reasonable probability of a more favorable result for state-law errors.]

either the *Chapman* or *Watson* standard of prejudice].)  The California Supreme Court's decision in *Cain*, is instructive to our analysis.

In *Cain*, the jury convicted the defendant of first-degree murder and found true an allegation the killing was committed during the course of an attempted rape.  (*Cain, supra*, 10 Cal.4th at p. 18.)  The trial court instructed the jury on the elements of the attempted rape special circumstances allegation, but the court failed to define the elements of attempt.  (*Id.* at p. 44.)  The court's instruction simply required the prosecution to prove "the murder was committed while the defendant was engaged in or was an accomplice in the commission or attempted commission of . . . a rape."  (*Id.* at p. 43, italics omitted.)

On appeal, the defendant challenged the jury instructions on the grounds the trial court failed to define the elements of "attempt."  (*Cain, supra*, 10 Cal.4th at p. 43.)  The *Cain* court rejected the defendant's argument and held the jury instruction merely restated "the common meaning of 'attempt,' " which is to " 'try' or 'endeavor to perform' the act."  (*Id.* at p. 44.)  The court held the defendant "could not 'try' to rape [the victim] without intending to do so and doing an act toward the rape's commission." (*Ibid.*)  Thus, the court concluded that the trial court's failure to define attempt did not contribute to the verdict, and the omission was harmless under either the *Chapman* or *Watson* standard of prejudice.  (*Ibid.*)

Here, Rodriguez's direction to tell others to shoot Doe or "give her a haircut," given in response to his fears that Doe had talked to the police, established Rodriguez's intent and an act towards the completion of the attempted witness dissuasion.  Moreover, the instruction given to the jury required it to find that Rodriguez "*tried to* prevent or discourage [Doe] from cooperating or providing information" for charges to be filed.  (Italics added.)

26

Like the defendant in *Cain*, Rodriguez could not have "tried" to prevent or discourage Doe from causing a charging document to issue without intending to do so and doing some act towards the crime's commission. Thus, nothing in the record supports a finding that the omission of the definition of attempt in CALCRIM No. 460 contributed to the verdict.

Moreover, for the purpose of proving an attempted crime, CALCRIM No. 460 requires evidence of more than "mere planning or preparation." Here, the conduct that served as the basis for the attempted witness dissuasion charge—Rodriguez's comments during the May 9 jail call—provided such evidence. Rodriguez's direction to McNamara to tell others to "shoot" Doe was a direct step towards preventing Doe from assisting in his prosecution. (See *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1519 [the crime of attempt to dissuade a witness "is completed once the defendant takes an immediate step toward having another person knowingly and maliciously attempt to persuade [or prevent] a witness from assisting in a prosecution."].) Although Rodriguez's attempt was ultimately unsuccessful, this is of no consequence for the purpose of an attempted crime. (*Ibid.*) Accordingly, even assuming any instructional error in the trial court's failure to give CALCRIM No. 460 sua sponte, we conclude that it would not compel reversal of the conviction.

## III.

### *Insufficient Evidence Supports The Gang Enhancement Attached to Count 7*

In his final claim on appeal, Rodriguez contends insufficient evidence supports two aspects of the gang allegation the court found true under section 186.22, subdivision (b). First, he contends evidence of the predicate offenses did not establish the existence of an organized criminal street gang. Second, he argues the prosecution presented insufficient evidence Rodriguez

committed the offense of attempted witness dissuasion with the specific intent to confer a common benefit to the gang.

As we discuss, assuming without deciding the prosecution proved the predicate offenses necessary to establish the existence of a criminal street gang, we conclude the evidence was insufficient to prove Rodriguez committed the crime of attempted witness dissuasion (count 7) with the specific intent to promote, further, or assist criminal conduct by gang members. Thus, the gang enhancement accompanying count 7 must be reversed for insufficient evidence.

### A. Additional Background

Following Rodriguez's jury trial, the court conducted a bifurcated bench trial to determine the truth of the gang allegation attached to count 7. (§§ 186.22, subd. (b), 1109.) At the trial, Detective Hernandez testified as an expert regarding the Sidro criminal street gang. The prosecution presented evidence of three predicate offenses to prove the existence of an organized criminal street gang.

#### i. Predicate Offenses

To establish a pattern of criminal activity for the purpose of proving the existence of an organized criminal street gang, the prosecution presented evidence of the following three predicate offenses by individuals alleged to be Sidro gang members: (1) an October 2016 murder; (2) an October 2017 auto theft; and (3) a January 2019 theft at a Sunglass Hut retail store. Rodriguez was not involved in any of these predicate offenses. We do not describe these predicate offenses here because they are not relevant to the grounds for our decision.

## ii. *Expert Gang Testimony*

Detective Hernandez testified that the San Ysidro criminal street gang, sometimes known as Sidro, operates primarily in Southern California. Sidro's primary activities include murder or manslaughter, witness intimidation, and vehicle theft. Detective Hernandez opined that Rodriguez is a Sidro gang member and was a member in May 2019 when he committed the criminal offenses alleged against him. The detective previously investigated Rodriguez, and during this investigation he observed Rodriguez associate with another Sidro gang member who went by the moniker "Trusty."

The prosecution entered photos of Rodriguez into evidence, and Detective Hernandez pointed out his gang-related tattoos. Rodriguez had a large tattoo on his neck that read, "Sidro," and another tattoo on his eyelids that read, "Still Sidro." Detective Hernandez testified that the tattoos on Rodriguez's forearms, "S Y," related to the Sidro street gang. Rodriguez also had the word "Malos" tattooed on his chest, which the detective identified as a subset of the Sidro gang. The prosecution entered several photos into evidence that depicted Rodriguez making gang signs attributed to the Sidro gang.

The prosecution provided a hypothetical to Detective Hernandez that mirrored the facts of this case. Detective Hernandez opined that, under the circumstances, an attempt to dissuade or prevent a witness from testifying would benefit the Sidro street gang. According to the detective, the dissuasive threats served two purposes. First, they would prevent the witness from "giving any kind of statement to law enforcement for the adjudication process." Next, it would let "that person and any other gang member know that you are not to cooperate with law enforcement specifically

against the gang member or any person in the gang whatsoever." The detective testified that seeking assistance from another gang member would make it less likely that a witness will cooperate with law enforcement.

Detective Hernandez opined that a Sidro gang member would tell a "woman who is not a Sidro gang member to have another Sidro gang member commit this act of intimidation or dissuasion," because it would let the other Sidro gang members know what happened. According to the detective, witness intimidation generally promotes criminal activity by the gang because it "allows them to do whatever they want to do with impunity without facing consequences from any law enforcement at all because no one will cooperate with them."

### B. *General Legal Principles*

Under section 186.22, subdivision (b), a gang enhancement applies to persons convicted of specified felonies that are: (1) "committed for the benefit of, at the direction of, or in association with any criminal street gang"; and (2) "with the specific intent to promote, further, or assist in criminal conduct by gang members." (See *People v. Perez* (2017) 18 Cal.App.5th 598, 607 (*Perez*).) As amended effective January 1, 2022, the statute provides that "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational."[10]

_____

[10] This provision was added to the statute as part of Assembly Bill 333. The new legislation made several changes to the statutory definitions relating to gang enhancements. As the Supreme Court has explained, "the Legislature was concerned with 'lax' interpretations of the prior law that allowed for overly expansive application of gang enhancements (Stats. 2021, ch. 699, § 2) and therefore sought to amend the law by 'making the standards for applying a gang enhancement more rigorous.' " (*People v. Cooper* (2023) 14 Cal.5th 735, 744–745.) "Although the STEP Act 'was originally enacted to target crimes committed by violent, organized criminal street gangs,' and was only meant to apply ' "in the most egregious cases where a pattern of criminal

(§ 186.22, subd. (g).) Reading subdivisions (b) and (g) together, the specific intent now required is an intent to provide a common benefit to members of a gang that is more than reputational. "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

A criminal street gang is defined as an "ongoing, organized association or group of three or more persons," and: (1) has a common name or common identifying sign or symbol; (2) has, as one of its primary activities, the commission of the offenses listed in section 186.22, subdivision (e)(1); and (3) whose members collectively engage in or have engaged in a pattern of criminal gang activity. (§ 186.22, subd. (f).) A pattern of criminal gang activity means the commission, attempted commission, or conspiracy to commit, two or more enumerated offenses in the statute for the benefit of a criminal street gang within three years of the underlying offense. (§ 186.22, subd. (e)(1).)

We review the sufficiency of evidence of a gang enhancement under section 186.22 for substantial evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) Under this deferential standard, we review the entire

___

gang activity was clearly shown," ' the STEP Act 'has been continuously expanded through legislative amendments and court rulings.' (Assem. Bill 333, § 2, subd. (g). The result, the Legislature found, was that '[c]urrent gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people based on their cultural identity, who they know, and where they live.' (*Id.*, § 2, subd. (a).)" (*People v. Clark* (2024) 15 Cal.5th 743, 760.) Among other things, Assembly Bill 333 "narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*Clark*, at p. 752 [quoting § 186.22, subd. (g)].)

record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid*.)

C. *Analysis*

Rodriguez contends the evidence at trial failed to prove he committed the offense of attempted witness dissuasion with the specific intent to confer a common benefit on other Sidro gang members.[11] According to Rodriguez, his threatening statements regarding Doe were an attempt to get himself out of the "legal plight" he faced from the weapons-related charges, rather than an attempt to facilitate criminal activities by the gang. He relies extensively on our high court's decision in *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*) to support his position.

*Renteria* involved a "lone actor" scenario in which the defendant, a member of the Sureño gang, discharged a firearm at two houses. (*Renteria, supra*, 13 Cal.5th at p. 957.) Although the defendant acted alone when he committed the shootings, the prosecution alleged he committed the crimes for the benefit of a criminal street gang. (*Ibid*.) The jury found the allegations true. (*Ibid*.)

---

[11] We requested and received further supplemental briefing from the parties on the specific intent issue.

32

The Supreme Court, applying "the law as it existed before the enactment of Assembly Bill 333" (*Renteria, supra*, 13 Cal.5th at p. 961, fn. 6), concluded insufficient evidence supported the gang allegations. (*Renteria, supra*, 13 Cal.5th at p. 971.) Although the defendant was a gang member, there was no evidence the defendant identified himself as a gang member during the shooting, took credit for the shooting on behalf of the gang, or committed the shooting with another gang member. (*Ibid.*) In reaching its conclusion, the court stated that "[t]o establish the requisite intent in a lone-actor case, the prosecution has often relied on expert opinion about the potential for a gang member's crime to benefit the gang by, among other things, enhancing a gang's reputation for violence among rival gangs or in the community more generally." (*Id.* at p. 966.) But, "[w]ithout more, generalized expert opinion that commission of a particular crime enhances the gang's power in the community by increasing its reputation for violence falls short . . . ." (*Ibid.*) The court therefore found insufficient evidence "that Renteria committed the shootings for the gang's benefit, with the specific intent to promote the criminal activities of gang members, as opposed to acting for his own, personal reasons." (*Id.* at p. 973.)

The People argue this case is unlike *Renteria* because here the gang expert testified that the Sidro gang benefited from Rodriguez asking another gang member to intimidate a potential witness. We agree that Rodriguez's conduct is not the typical lone actor scenario described by the court in *Renteria*. Rodriguez committed the underlying weapons offense by himself, but in his attempt to dissuade Doe from cooperating against him, Rodriguez asked his girlfriend and an unidentified woman to contact another gang member, Trusty, to commit the witness dissuasion. Thus, there is at least

33

some evidence that Rodriguez attempted to commit the witness intimidation in association with another gang member.

But criminal conduct that a defendant commits in association with another gang member must still be committed with the specific intent to promote, further, or assist criminal conduct by gang members. (*Perez, supra,* 18 Cal.App.5th at p. 607; see also *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 (*Ramon*) [although defendant "was with another gang member" and "in gang territory" when he committed his crimes, these facts alone were "not adequate to establish that [he] committed the crime with the specific intent to promote, further, or assist criminal conduct by gang members"].) Even before the enactment of Assembly Bill 333, California courts repeatedly held, "[n]ot every crime committed by a gang member is gang related. Nor can a crime be found to be gang related simply because the perpetrator is a gang member with a criminal history." (*Perez*, at p. 607, internal citations omitted; see also *Albillar, supra*, 51 Cal.4th at p. 60.) Rather, the enhancement applies only when " 'a defendant has personally committed a gang-related felony with the *specific intent* to aid members of that gang' " and thus confer a common benefit. (*People v. Rivera* (2019) 7 Cal.5th 306, 331, italics added.) Expert opinion testimony may be sufficient to establish that "particular criminal conduct benefited a gang" (*Albillar*, at p. 63), but such testimony cannot be "purely conclusory or factually unsupported." (*Perez*, at p. 608.)

The People argue Rodriguez acted with the intent to prevent people from "snitching" on his gang, which would benefit the gang as a whole, and that he acted with the intent to promote "Trusty's criminal conduct by telling [McNamara] to tell Trusty to shoot [Doe] in the head." The People cite to our high court's decision in *Albillar* in support of their contentions.

34

In *Albillar,* three gang members were convicted of sexually assaulting a victim in concert, and the jury found true an allegation the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b). (*Albillar, supra,* 51 Cal.4th at p. 50.) On review, the Court analyzed the sufficiency of the evidence to support the gang allegation. (*Id.* at p. 51.) The *Albillar* court noted that "[n]ot every crime committed by gang members is related to a gang," (*Id.* at p. 60), but the court concluded the evidence demonstrated the defendants "came together *as gang members* to attack [the victim]." (*Id.* at p. 62.) Thus, the evidence supported a conclusion the defendants committed the crime in association with a gang, and that the crime benefited the gang members. (*Id.* at pp. 67–68.) In reaching its conclusion, the Court held that the gang enhancement statute does not require a defendant act with the specific intent to promote, further, or assist a gang—rather "the scienter element of the enhancement requires only 'the specific intent to promote, further, or assist in *any* criminal conduct by *gang* members.'" (*Id.* at p. 51.)

As we have noted, the language of section 186.22 has been amended by Assembly Bill 333 since the Supreme Court's decision in *Albillar*.[12] Before

_____

[12] "Assembly Bill 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three

the statutory amendments made by Assembly Bill 333, section 186.22, subdivision (b) applied to offenses committed "with the specific intent to promote, further, or assist in *any* criminal conduct by gang members." (§ 186.22, former subd. (b)(1), italics added.)  The word "any" has now been deleted from subdivision (b)(1), and the statute defines the phrase, "benefit, promote, further, or assist" as providing a "*common* benefit to members of a gang where the common benefit is more than reputational." (§ 182.66, subd. (g).)  It is unclear to us whether the holding of *Albillar* survives these legislative changes.  *Albillar* did not consider or discuss the current statutory requirement that the felonious conduct underlying the gang enhancement must be committed with the specific intent to provide a *common benefit* to other gang members.

We need not decide this question, however, because we do not find the facts of *Albillar* to be similar to this case.  (See *Renteria, supra*, 13 Cal.5th at p. 968 ["*Albillar* is best understood in light of its particular factual context"].)  There, multiple gang members committed an attack in coordination with each other, and the expert at the trial opined that their method of attack was intended to enhance the gang's reputation for viciousness.  (*Albillar, supra*, 51 Cal.4th at p. 63.)  By contrast, here, Rodriguez made telephonic threats to his girlfriend and another unidentified woman regarding the potential for a

---

years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

witness to testify against him in his pending criminal case. Although he attempted to enlist another gang member to commit the attempted witness dissuasion underlying count 7, we are not persuaded that Rodriguez specifically intended to confer a common benefit on the gang or other gang members by attempting to prevent a witness from cooperating in a matter against him regarding a weapons-related offense that he committed by himself and that was not shown to be gang-related. (See *Renteria, supra*, 13 Cal.5th at p. 968 [requiring evidence "grounded in specific facts that show the defendant acted on behalf of a gang rather than for personal reasons"].)

Though decided before the enactment of Assembly Bill 333, we find the reasoning of the court in *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1364 (*Daniel*) to be helpful. In *Daniel*, a minor entered a grocery store with two people, one of whom was a gang member and the other a gang affiliate. (*Id.* at pp. 1353–1355.) All three individuals were wearing a color associated with the gang. (*Id.* at p. 1356.) The gang member and gang affiliate left the store, and the minor then stole a bottle of alcohol and assaulted the store manager in the process. (*Id.* at p. 1353.) The juvenile court found true a charge that the minor committed a robbery, as well as an allegation he committed the offense for the benefit of a criminal street gang. (*Ibid.*)

On appeal, the *Daniel* court concluded that although the minor had committed the crime "in association with" other gang members, there was insufficient evidence he intended to promote, further, or assist in criminal conduct by other gang members. (*Daniel, supra*, 195 Cal.App.4th at pp. 1359–1361.) The court reasoned that the minor and his associates did not identify themselves as gang members, and there was no evidence the witnesses or victims knew they were gang members. (*Id.* at p. 1363.) There was also no evidence the gang members had assisted the juvenile in the

37

commission of the robbery, or that they were even aware that it took place. (*Id.* at p. 1361.) In reaching its conclusion, the court explained that expert testimony may not be used to apply the gang enhancement statute to "cover virtually *any* crime committed by someone while in the company of gang affiliates." (*Id.* at p. 1364.)

Similarly, here, the underlying crimes for which Rodriguez was taken into custody—the unlawful possession of firearms and ammunition—were not shown to be gang-related. The prosecution's gang expert gave no opinion that these crimes had anything to do with the gang. (Cf. *Ramon, supra*, 175 Cal.App.4th at pp. 849–853 [insufficient evidence that firearm possession and possession of stolen vehicle by gang member in gang territory were committed with specific intent to promote, further, or assist in criminal conduct by gang members].) Rodriguez's attempt to intimidate a witness to his own crimes was plainly intended to benefit himself, but there is no evidence that he intended to benefit other gang members. During Rodriguez's attempt to prevent Doe from cooperating with law enforcement related to these crimes, nothing he said or did suggested an intent to confer any non-reputational benefit on other gang members or the gang as a whole. His conversation with McNamara about his suspicions that Doe may have cooperated with law enforcement, and McNamara's question about whether Doe's statements may appear in his "paperwork," were related to Rodriguez's fear that he would suffer legal consequences if she provided harmful statements to the police. Although it is possible that his attempt to intimidate Doe incidentally bolstered the gang's reputation, there is no evidence Rodriguez committed the crime with the *specific intent* to confer a common non-reputational benefit on the gang as a whole or other gang members, rather than for his own personal benefit.

The People further contend that Rodriguez's witness intimidation "show[ed] others that if they witnessed any Sidro gang members committing a crime that they should not tell or cooperate with law enforcement. And if they did, they would get hurt or killed." The People argue this evidence established proof of a common benefit to the Sidro gang.

Even under prior law, this theory would amount to a prohibited reputational benefit. (*Renteria, supra*, 13 Cal.5th at pp. 958–959, 966–967 [rejecting similar reputational theory under the law as it existed before enactment of Assembly Bill 333].) Under Assembly Bill 333, the statute now explicitly excludes such reputational benefits. The suggestion that witness dissuasion benefits the gang because it instills a generalized fear of the gang in the community is simply another way of saying the crime bolsters the gang's general reputation for intimidation, violence, and witness retaliation. Section 186.22 requires proof of more than a reputational benefit to meet the elements of the gang enhancement statute. (§ 186.22, subd. (g) ["to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational."].) Under the People's theory, the gang enhancement statute would apply to the offense of intimidating a witness under any circumstance if the underlying crime was committed by a gang member. Although section 186.22, subdivision (g), lists witness intimidation as an example of a crime that *may* provide a non-reputational benefit to the gang, the expert may not opine that *any* form of witness intimidation is gang-related simply because it instills fear in the community. (See *Perez, supra*, 18 Cal.App.5th at p. 610 [it is improper for an expert to opine that an offense is gang related simply "because the use of violence enhances the gang member's reputation, and thereby inures to the gang's benefit by instilling fear in the community."].) Courts in California

39

have "soundly rejected such a sweeping generalization untethered, as it is, to specific evidence of both prongs of the gang enhancement." (*Ibid*.)

We acknowledge that evidence of an individual's specific intent to confer a benefit to a gang may often be proven by circumstantial evidence. (See *People v. Cole* (1985) 165 Cal.App.3d 41, 48 ["Specific intent may be, and usually must be, inferred from circumstantial evidence."].) But, here, there is simply a lack of evidence, circumstantial or otherwise, to suggest Rodriguez attempted to intimidate Doe for any reason other than his own personal benefit. As amended by Assembly Bill 333, the statute refers to a "common benefit to *members* of a gang" (§ 186.22, subd. (g), italics added), not just the defendant. (See also *Renteria, supra*, 13 Cal.5th at p. 965 ["the statute refers to the intent to promote 'criminal conduct by gang *members*' (§ 186.22(b)(1), (4), italics added), the most natural reading of which means the promotion of criminal conduct by more than one member of the gang"].) If we were to reach a contrary conclusion under the facts of this case, we would be endorsing the principle that *any* witness intimidation by a gang member would qualify for the enhancement under section 186.22—even if the only benefit to other gang members is to enhance the gang's general reputation for intimidation or violence against witnesses. The gang statute does not allow for such broad culpability. Accordingly, the enhancement must be reversed for insufficient evidence, and the matter remanded for resentencing.

40

DISPOSITION

The gang enhancement finding is reversed, the sentence is vacated, and the matter is remanded for a full resentencing.  The judgment is otherwise affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.